2004 WY 120

**James Robert DUKE, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 02–270.

Supreme Court of Wyoming.

Oct. 25, 2004.

930

Representing Appellant: Ken Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Marion Yoder, Senior Assistant Public Defender. Argument by Ms. Yoder.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General. Argument by Ms. Tibbetts.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] This is an appeal from the judgment and sentence of the district court for the Third Judicial District, Sweetwater County, Wyoming, entered on September 30, 2002, convicting James Robert Duke of two counts of first degree murder, in violation of Wyo. Stat. Ann. § 6–2–101(a), and four counts of solicitation of the felony of first degree murder, in violation of Wyo. Stat. Ann. § 6–1–302(a) and § 6–2–101(a). Duke assigns errors concerning the trial court's denial of his pretrial motion for a change of venue, the trial court's allowing him to appear before the jury in leg restraints and allowing excessive courtroom security during the trial, several instances of alleged ineffective assistance of counsel, the sufficiency of the evidence to sustain two convictions for first degree murder, the trial court's jury instructions, prosecutorial comment during closing argument, and the cumulative effect of these alleged errors on his right to a fair trial.

[¶ 2] We find no error and affirm.

## ISSUES

[¶ 3] Duke and the State agree that the appellate issues are:

I. Did the trial court err in not granting Duke's pretrial motion for a change of venue?

II. Did the trial court err in allowing Duke to be tried in an atmosphere of excessive courtroom security and to appear before his jury in restraints, and has the State shown that such measures did not overcome the presumption of innocence or abridge the right to a fair trial due every defendant?

III. Was Duke denied the effective assistance of counsel during trial?

IV. Was sufficient evidence produced at trial to support Duke's first degree murder convictions?

V. Did the trial court commit reversible error in instructing the jury?

VI. Did the prosecutor's comments during closing arguments constitute reversible error?

VII. Was Duke deprived of a fair trial due to the cumulative effect of the alleged trial errors?

### Procedural Background

[¶ 4] On October 11, 2001, a criminal Indictment was filed in the trial court, Docket No. CR–01–209–R, charging Duke with first degree murder in the August 10, 1996, deaths of his five-year-old son, Erik Robert Duke (Count I), and his wife, Liana Mae Duke (Count II), and the solicitation of their murders (Counts III and IV, respectively). Duke was later charged by Information on January 25, 2002, Docket No. CR–02–49–R, with soliciting the murders of his father, James Larry Duke (Count I), and his mother, Roberta Duke (Count II). On March 28, 2002, Duke was arraigned on the charges contained in the Indictment and entered pleas of not guilty. Following a preliminary hearing with respect to the charges contained in the Information, Duke was bound over to trial court, where he pled not guilty to those charges on April 8, 2002.

[¶ 5] On March 28, 2002, Duke filed a motion for a change of venue. Relying on five newspaper articles published between January 24 and March 2, 2002, Duke alleged that excessive pretrial publicity made it impossible for him to receive a fair trial in Sweetwater County. On April 12, 2002, the State filed a motion to join the two criminal actions for purposes of trial. During a motion hearing on April 25, 2002, the trial court granted the State's motion for joinder after Duke stipulated to the joinder but deferred ruling on Duke's change of venue motion pending jury selection.

[¶ 6] Duke's jury trial began on August 12, 2002. At the conclusion of voir dire, Duke accepted the jury as empaneled and did not reassert or ask the trial court to rule on his request for a change of venue. On August 15, 2002, during the State's case-in-chief, the jury was permitted to view the area where the alleged murders of Liana and Erik Duke occurred. On August 23, 2002, after approximately eight days of testimony and eight hours of deliberations, the jury returned a verdict of guilty on all six charges.

[¶ 7] On August 29, 2002, Duke filed a motion to set aside his first degree murder convictions in Docket No. CR–01–209–R. Duke contended those convictions were void because the indictment upon which they were based was defective. A few days later, Duke filed a motion for judgment of acquittal, claiming the trial evidence was insufficient to sustain his murder convictions in Docket No. CR–01–209–R. During a hearing on September 4, 2002, the trial court denied Duke's motions.

[¶ 8] Duke was sentenced on September 25, 2002, to life imprisonment on all six counts. In Docket No. CR–01–209–R, the trial court ordered that Counts I and III be served concurrently with each other, but consecutive to Duke's existing federal sentence, and Counts II and IV be served concurrently with each other, but consecutive to the sentences imposed on Counts I and III. In Docket No. CR–02–409–R, the trial court ordered the life sentences on Counts I and II be served consecutive to each other and consecutive to the life sentences imposed in Docket No. CR–01–209–R. Duke filed his notice of appeal on October 3, 2002.

[¶ 9] On January 14, 2003, this Court, pursuant to a motion filed by Duke, remanded the case to the trial court for an evidentiary hearing, the purpose of which was to enable Duke to develop a record to support his claims that he was improperly restrained at trial and his trial counsel was ineffective for failing to properly object to the restraints. Following an evidentiary hearing on March 28, 2003, the trial court made findings of fact and conclusions of law and entered an order on April 11, 2003, finding that Duke was shackled during trial, the use of leg restraints was justified under the circumstances, trial counsel probably raised the propriety of the restraints before testimony was taken, and Duke suffered no prejudice as a result of having been shackled during trial.

### General Background Facts

[¶ 10] Around 3:00 p.m. on August 10, 1996, Duke notified the dispatch center at the

Sweetwater County Sheriff's Department that his wife and son had fallen from a cliff in the Lost Dog area south of Green River, Wyoming. Upon arriving at the scene, emergency personnel discovered the battered bodies of Duke's wife, Liana, and his five-year-old son, Erik, at the bottom of a two hundred foot cliff. Duke essentially reported that he and his family had stopped on the cliff after a period of four-wheeling in the Lost Dog area. He stated that, after walking around awhile, he went to his vehicle to get something to drink. Shortly thereafter, he heard Liana scream his name and, when he looked up, both his wife and child were gone. He stated he ran back to the area where he left them, saw them lying at the bottom of the cliff and tried, without success, to reach them. Although authorities had their suspicions about Duke and what actually occurred that day, Liana's and Erik's deaths were ruled accidental. Approximately two weeks after their deaths, Duke collected the $60,000 proceeds from the life insurance policies on Liana and Erik.

[¶ 11] Evidence of Duke's involvement in his wife's and child's deaths was provided to authorities on January 4, 1999. On that day, Roger Brauberger, a long-time friend of Duke's, told Lieutenant Mont Mecham of the Green River Police Department that Duke had been calling him from Houston, Texas, since October 1998 offering him money to kill his parents, Larry and Roberta Duke. Brauberger also informed Lieutenant Mecham that Duke had offered him $23,000 to kill Liana and Erik shortly before their deaths. Lieutenant Mecham contacted the F.B.I. and the Sweetwater County Sheriff's Department about what Brauberger had reported. The Sheriff's Department immediately reopened the investigation into Liana's and Erik's deaths.

[¶ 12] During the ensuing investigation, the Green River Police Department set up three recorded telephone calls between Brauberger and Duke. In each instance, the plans to kill Duke's parents were discussed. During a call on January 4, 1999, Duke informed Brauberger that his brother, Mike Duke, was going to do the job on January 24, 1999. Duke told Brauberger that he needed only to pick Mike up in Denver, act as a lookout while the job was being done, and then return Mike to Denver.

[¶ 13] The next recorded call occurred on January 7, 1999. During that call, Brauberger advised Duke that he was considering accepting Duke's earlier offer of $20,000 to kill his parents. When Brauberger asked for suggestions how it could be done, Duke suggested that a .22 caliber gun be used, since it was quiet and no louder than a door slam, and offered to provide Brauberger a key to the home. Duke further stated that the job needed to be done "ASAP," but the date had to be carefully chosen to ensure he and his brother had alibis for the time of the killings. Duke also indicated his parents had life insurance policies, and he might be willing to up the price by $5,000 if Brauberger was willing to do the job.

[¶ 14] During the last recorded call on January 8, 1999, Duke told Brauberger that the plot to kill the parents was his "brother's gig," and his brother had agreed to pay Brauberger the extra $5,000 to do the job. Duke offered to send Brauberger money to buy a .22 caliber gun but declined to send him a key to the house because he did not want the killings to appear planned. During that call, Brauberger tried, without success, to get Duke to admit killing Liana and Erik in 1996. Duke, however, acknowledged that he and Brauberger had discussed killing family members earlier, but he "didn't want nothing to do with it." Before the call was completed, police arrived and arrested Duke.

[¶ 15] The trial consumed two weeks, with the prosecution presenting forty-nine witnesses on direct (two witnesses, Dale Majhanovich and Susan Murphy, testified twice) and two in rebuttal, one of whom it had also called on direct. The defense presented six, including Duke himself.

[¶ 16] For the prosecution, Brauberger testified he had been friends with Duke since seventh grade. He stated Duke was not happy about Liana's getting pregnant in high school and having to get married. Brauberger recounted that he spent a lot of time with Duke after Erik was born and never saw Duke hug, kiss or play with Erik. Brauberger also stated Duke enjoyed going four-

wheeling and was very familiar with the roads and trails in the Lost Dog area. Brauberger also testified that, a few months before Liana's and Erik's death, Duke offered him $15,000 to kill them. Duke had told him that divorcing Liana was not an option because his parents would not approve. Brauberger initially thought Duke was joking and did not take him up on his offer. Approximately a month later, while they were four-wheeling, Duke approached him again and offered him $20,000 and suggested a plan to kill Liana and Erik. Although he still believed Duke was joking, Brauberger told him he would consider it. A few weeks later, Duke again approached Brauberger about killing Liana and Erik and asked him what it would cost to get the job done. In reply, Brauberger gave him a figure of $23,000. According to Brauberger, Duke told him, "For that amount, I don't want to know when, I don't want to know where. Just do it." Brauberger stated that, shortly thereafter, he told his brother, Roland Brauberger, and Mike Dieters about Duke's offers, although he did not mention Duke's name in his conversation with Dieters. Brauberger also testified that, on August 10, 1996, he told Dieters that the wife and child he was asked to kill died that day.

[¶ 17] Brauberger further testified about the numerous telephone calls he received from Duke between October 1998 and Duke's arrest on January 8, 1999. He stated that, at the beginning, Duke merely wanted him to obtain some semi-automatic pistols with silencers for him. Later on, Duke asked Brauberger if he would be interested in killing Duke's parents for $20,000. According to Brauberger, Duke told him that, "I've done family before, I don't like it." Duke also told him that it was going to happen, and he was offering him the job first because Duke knew Brauberger needed the money. Brauberger revealed that, during another call, Duke informed him that his brother, Mike Duke, was going to kill his parents, and Duke offered him $5,000 to assist Mike in doing the job. Brauberger testified he eventually told his wife and father, who advised him to call the police.

[¶ 18] Law enforcement and emergency personnel at the scene on August 10, 1996, testified about Duke's various accounts of the events surrounding Liana's and Erik's deaths, which included: (1) they were in the area exploring; (2) he had never been in the area before; (3) they stopped on the cliff because they were tired of four-wheeling; (4) Erik was chasing lizards on the top of the cliff; (5) Erik was playing with toys; (6) he went to the vehicle to get something to drink when they fell; (7) he went to the vehicle to get popcorn; (8) he did not see Liana and Erik fall; and (9) he saw Erik slip, Liana grab his arm and both fall over the cliff. Their testimony also cast doubt on Duke's claim that he was unable to get down to check on the status of his wife and child. In fact, their testimony revealed that it was a very simple descent down the face of the cliff to the location where Liana's and Erik's bodies came to rest. Testimony was also presented that Duke's demeanor was not typical of someone who had suffered such an unexpected tragedy.

[¶ 19] The State also presented the following witnesses:

—Deputy Alvesteffer of the Sweetwater County Sheriff's Department testified that the area of the cliff where Liana and Erik fell was not visible to anyone at the nearby lake or campsites. He also testified that anyone standing in that area could see cars parked a quarter mile away and could see the dust created by cars traveling in that area several miles away. He further testified that Duke told him he had never previously been to the area. Additionally, Deputy Alvesteffer testified Duke never showed any emotion at the scene even when the bodies of his wife and child were brought up from the bottom of the cliff. He also stated Duke made no attempt to go to the bodies after they arrived at the top.

—Marvin Brauberger testified that his son Roger broke down a couple of weeks after Liana's and Erik's deaths and told him Duke had previously asked him to kill them. He also testified that in early January 1999 Roger told him that Duke approached him about killing Duke's parents.

Marvin told Roger to report it to the police, which Roger did the following morning.

—Michael Dieters testified that, two weeks before Liana's and Erik's deaths, Brauberger told him someone had offered him $20,000 to kill his wife and son. He further testified Brauberger told him on August 10, 1996, that the wife and child he was asked to kill had died earlier that day.

—Roland Brauberger testified that Roger told him, about a month before Liana's and Erik's deaths, that Duke had offered him money to kill them.

—James Anson testified that Brauberger told him he had been approached by Duke to kill Duke's parents.

—Connie Arambel, a neighbor of Duke's in 1996, testified she heard Duke yelling at Liana on numerous occasions and calling her vulgar names.

—Loralee Reuss, Liana's sister, recounted her conversation with Duke shortly after Liana's and Erik's death. She stated Duke informed her that Liana and Erik were on the edge of the cliff throwing rocks. He claimed he went to the jeep to get a soda and heard Liana scream. When he turned around, they were gone. He informed her that he was not able to get down to them and he drove to the main road to call 911. She also testified that Liana was afraid of heights and Liana thought falling was the worst way to die. Reuss did not believe Liana would have chosen to be on that cliff. She further testified Liana was a protective mother and would not have allowed Erik to run around, stand on the edge or throw rocks over the edge of the cliff.

—Cynthia McMurray–Smith testified that Duke told her during an interview on January 19, 1999, at the United States Marshal's Office in Houston, Texas, that his wife accidentally died during an argument on August 10, 1996. Duke denied having a child.

—Detective Don Beckum testified regarding his interview of Duke on August 19, 1996. According to Detective Beckum, Duke reported they had been riding around in their jeep and stopped on the cliff to stretch their legs. Duke related they had been walking around the cliff and letting Erik throw rocks. Duke stated he had gone to the jeep to get something to drink when he heard Liana scream his name. Upon turning around, he noticed they were gone. Duke also said he noticed the path leading to the bodies but did not believe he could make it down to check on them.

—Don Johnson testified that, while Duke worked for him as an independent contractor in 1995–1997, he never observed any displays of affection between Duke and Liana or between Duke and Erik and never heard Duke talk about Erik.

—Jennifer Butler recounted what Duke had told her in November 1997 about the circumstances surrounding Liana's and Erik's deaths. Duke told her that they had gone to the area for a picnic. While he was cleaning up and loading the car, Liana and Erik fell. She testified that Duke also told her Liana was "still alive a little while before help arrived."

—David Dell, a close friend of Duke's, testified that, after Duke was married, he and Duke and sometimes Brauberger, frequently went out "chasing girls," and Duke would remove his wedding ring. Dell also stated the Lost Dog area was one of Duke's favorite places to go four-wheeling, and he and Duke had been to the cliff where the deaths occurred on a couple of occasions before August 10, 1996. He further testified that Duke did not appear to be suffering at Liana's and Erik's funeral.

—Dave Ide testified that on August 11, 1996, Duke told him that he, Liana, and Erik had gone to the cliff area to build a campfire and cook popcorn. Duke stated he was at the jeep and did not see Liana and Erik fall. Duke said he did not go to the bodies because the path was too steep for him.

—Dawn and Chad Gunter each testified that Duke told them that he, Liana and Erik were having a picnic on the cliff. Duke stated to the Gunters that he was putting the toys away in the jeep when Liana and Erik fell. Duke stated to them that the cliff had given away and it was too

steep to go down to Liana and Erik. Duke also indicated he heard Erik wheezing blood.

—Steven Miller, a professor in botany and mycology at the University of Wyoming, testified regarding his examination of the cliff in 2000. He testified no evidence existed that the cliff area in question had crumbled or fallen away on August 10, 1996. He stated the last time any disturbance occurred in that area was around 1960–1970.

—Ralph Davidson, Liana's father, and John Davidson, Liana's brother, both related Liana was afraid of heights. Ralph Davidson also testified Liana was a very cautious mother and doubted she would have chosen to be on the cliff with Erik that day.

—Debra Litz testified she observed Duke yelling at a woman and child at Smith's Grocery in April 1996. She said Duke angrily knocked over the shopping cart and continued to yell at the crying woman and child as they picked up the spilled items. Litz further testified to seeing the same woman crying in the women's bathroom at the Wild Horse Saloon in June 1996. According to Litz, the woman reported that her husband was not nice to her and he "sometimes wants to kill me." Litz testified Duke was at the bar and the woman said she was there because a friend had told her that her husband was with another woman.

—Chrystal Robinson recounted the one-month affair she had with Duke in 1994. Robinson testified she went four-wheeling with Duke on several occasions at the Gorge and cliff areas. She said she had been with Duke on the cliff where his wife and son died in 1996. She further testified Duke told her he did not get along with his wife and he had never bonded with his son. According to Robinson, Duke said he was looking for a way out of the marriage, other than divorce, so he did not have to pay child support.

—Kerry Kelley related that Duke had told her they were on the cliff because Erik wanted to go lizard hunting for his birthday. He stated he was on his way to the jeep to get a soda when he heard Liana scream Erik's name. He turned around and saw Liana grab Erik's arm, and then both went over the cliff. She testified Liana was a cautious mother and would never have let Erik run around on the cliff chasing lizards. She also indicated that, while Duke was very close to her daughter, McKenzie, he appeared cold to Erik and never interacted with him.

—Mike Duke, Duke's brother, testified that he and Duke had discussed becoming hit men and bumping off people, including their parents. Mike Duke stated he learned in October or November 1999, that Duke had been talking to Brauberger about killing their parents. Mike Duke further testified that they were not serious about killing their parents, and that Duke was simply playing a big joke on Brauberger, although he acknowledged telling the grand jury and the FBI earlier that Duke was not joking. Mike Duke denied that the murder plot was his idea and indicated he was unaware of the details of the conversations between Duke and Brauberger. Mike Duke also acknowledged he and Duke stood to receive around $200,000 from their parents' estate and life insurance policies upon their deaths.

[¶ 20] In his defense, Duke testified that he loved Liana and Erik and did not kill them. He asserted that they accidentally fell to their deaths while he was at the jeep packing up and getting something to drink. He said they had planned to go to the bay along the river and make popcorn, but ended up on the cliff by mistake. Among other things, Duke denied being at the cliff with David Dell and Chrystal Robinson and asking Roger Brauberger to kill Liana and Erik. Duke also claimed that, although he talked to Brauberger about killing his parents, he never seriously considered it. In fact, he maintained that the murder plot was Brauberger's idea and he was only playing along with it as a practical joke on Brauberger. Duke also admitted pleading guilty in federal court on a charge relating to the murder plot concerning his parents, but claimed he did so to avoid a 60–year prison sentence.

[¶ 21] We shall set forth additional facts as necessary as we discuss each of the issues on appeal.

## Issue One: Change of Venue

[¶ 22] About four and one-half months before trial, Duke moved under W.R.Cr.P. 21 for a change of venue from Sweetwater County to another county in the Third Judicial District. To his motion he attached five newspaper articles concerning his case that had appeared on January 24, January 26, January 31, February 28, and March 2, 2002, in either the Green River Star or the Dailey Rocket Miner, newspapers of general circulation in Sweetwater County. These newspaper articles reported, among other things, that Duke had plead guilty to, or had been convicted of, a felony in federal court for the same or similar crimes which were pending against him in state court; and the articles also contained purported testimony of alleged witnesses indicating Duke's involvement in the alleged crimes. Duke asserted that the information in these articles had prejudiced prospective jurors against him which prejudice could not be overcome in Sweetwater County. During a hearing on April 25, 2002, the trial court acknowledged the pretrial publicity about the case but concluded a change of venue was inappropriate absent Duke's showing of actual prejudice. The trial court deferred ruling on Duke's motion until jury selection.

[¶ 23] Jury selection began on the morning of the first day of trial, August 12, 2002. Prosecution counsel and Duke's counsel examined the jury panel for cause and exercised their peremptory challenges. The transcript of jury selection consists of 207 pages. During the examination, most of the venire stated they had heard about the case from relatives, friends, or news media (radio and newspaper) coverage. Nine of the thirty-eight potential jurors indicated they had formed an opinion about Duke based upon what they had heard or read. Of those nine, the trial court excused five for cause; two were excused following peremptory challenges, and two were seated on the jury. One of those potential jurors excused for cause was excused on Duke's motion. The two seated jurors who had formed an opinion about Duke stated unequivocally that they could set aside such opinions and render a fair verdict based exclusively on the evidence presented at trial. Of the remaining prospective jurors, each stated that, despite the publicity surrounding the case, he or she could render a fair and impartial decision based solely on the court's instructions and the evidence presented at trial. Each also indicated he or she would hold the prosecution to its burden of proving Duke's guilt as to each charge beyond a reasonable doubt. At the close of jury selection, Duke's counsel did not object to the jury as empaneled and did not renew his pretrial motion for a change of venue.

[¶ 24] Duke insists that, despite what occurred during jury selection, he did not receive a fair trial because of the excessive pretrial publicity. He argues that neither the trial court's inquiry, nor counsels', was sufficient to evaluate the jurors' assurances of impartiality. He claims that community feeling was running very high and all the major participants involved in the case were long-time community residents. He contends that the degree of pretrial publicity was great and the trial court, in the exercise of reasonable caution, should have recognized that prejudice against Duke was so great within the small town of Green River and Sweetwater County "that venue should have been moved, regardless."

[¶ 25] In *Urbigkit v. State*, 2003 WY 57, 67 P.3d 1207 (Wyo.2003), we stated our standard of review and summary of Wyoming change-of-venue law:

> We review the denial of a motion for change of venue under an abuse of discretion standard, meaning we will not interfere with the trial court's decision unless the trial court acted in a manner exceeding the bounds of reason under the circumstances. *Nixon v. State*, 994 P.2d 324, 326–27 (Wyo.1999). The party moving for change of venue has the burden of showing actual prejudice in the minds of the jurors so great that a fair trial cannot be obtained. *Id.* at 327.

We have summarized the law in Wyoming relating to change of venue as follows:

> Criminal defendants in Wyoming have a constitutional right to a trial by an impartial jury. Wyoming's constitutional provision grants the right to trial "by an impartial jury of the county or district in which the offense is alleged to have been committed." Wyo. Const. art. 1, § 10. The legislative provision mirroring the constitution requires "[e]very criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law." Wyo. Stat. Ann. § 1-7-102(a) (LEXIS 1999). Trial proceedings are transferred to another county "only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county." W.R.Cr.P. 21(a).
>
> This Court has adopted a two-part test for determining whether a change of venue should be granted after *voir dire* because of pre-trial publicity: " 'First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during *voir dire* examination.' " *Sides* [*v. State* ], 963 P.2d [227], 231 [(Wyo.1998)] (quoting *Murry* [*v. State* ], 713 P.2d [202,] 208 [(Wyo.1986)]).

*Urbigkit*, ¶¶ 26–27 (alterations in original).

[¶ 26] Applying the first prong of the test, we note that Duke relied on five newspaper articles from the county's general circulation newspapers, the first one of which appeared approximately seven months before his trial and the last one of which appeared five months before his trial. We have read the articles; they are generally factual in nature, reporting information obtained from court documents and from a potential witness. We do not find them to be sensational, inflammatory, or prejudicial. Neither the nature nor the extent of the news coverage justifies a finding that the trial court abused its discretion in denying Duke's motion under the first prong of the change-of-venue test.

[¶ 27] Applying the second prong of the test, we also see nothing in the record requiring reversal. The prosecutor, Duke's counsel, and the trial court appropriately and properly examined the venire. The potential jurors responded to that examination in a forthright manner. There is simply no indication in the record that the pretrial publicity in this case made jury selection difficult or created such prejudice that a change of venue was necessary. Duke's first issue has no merit.

### Issue Two: Whether Duke was denied a fair trial because jurors observed him in leg restraints during the trial

[¶ 28] On January 14, 2003, this Court granted Duke's motion and remanded the case to the trial court for an evidentiary hearing to enable Duke to develop a record on the issue whether he was improperly restrained at trial and whether his trial counsel rendered ineffective assistance of counsel for failing to object to such improper restraint. The trial court held an evidentiary hearing on March 28, 2003, receiving testimony from Duke, Duke's trial counsel, one of the prosecutors, the transport officer of the county sheriff's office, a former county sheriff, a deputy United States Marshal, the jail administrator, and jurors. After the evidentiary hearing, the trial court issued findings of fact and conclusions of law. The trial court found that Duke was wearing leg restraints during the trial and the jurors saw him in those restraints. The trial court also found Duke's trial counsel probably made a request for removal of those restraints to the trial court at the end of an in-chambers hearing on the first day of trial; and the trial court did not respond to that request.

[¶ 29] On appeal, Duke claims his having to appear in leg restraints before the jury was inherently prejudicial and deprived him of a fair trial under *Asch v. State*, 2003 WY 18, 62 P.3d 945 (Wyo.2003), and our decisions since that seminal decision. *See, e.g., Urbigkit*, ¶¶ 16–24. The State recognizes the trial court's failure to hold a pretrial hearing concerning the necessity of in-

trial leg restraints, as prescribed in *Asch*, could be found to be an abuse of discretion and, therefore, error. The State observes, however, that in *Daniel v. State*, 2003 WY 132, ¶ 15, 78 P.3d 205, ¶ 15 (Wyo.2003), we held that, where the jury did not view or hear the accused in leg restraints during trial, a trial court's error in allowing restraints without a pretrial hearing as mandated by *Asch* was subject to harmless error review. We also noted that, according to *State v. Finch*, 137 Wash.2d 792, 975 P.2d 967, 1006–07 (1999), some courts apply harmless error analysis where overwhelming evidence of the accused's guilt exists. *Daniel*, ¶ 15. Recognizing it bears the burden of demonstrating the trial court's error was harmless beyond a reasonable doubt, the State declares it can satisfy that burden. The State then points to the trial court's findings of fact and conclusions of law in its remand decision to the effect that, given the trial court's knowledge of the case, the accused, courtroom security concerns, the trial audience, and the potential for disturbances, a pretrial hearing would not have changed the trial court's decision to allow the leg restraints during trial. The State also points to seven factors which the trial court identified as justifying the allowance of restraints:

(1) Duke was serving a ten-year federal sentence and was facing six potential life sentences on the state charges;

(2) Duke was an escape risk;

(3) the U.S. Marshals' policy would have required that Duke be shackled during the trial;

(4) the courtroom lacked adequate security;

(5) Duke, during various stages of the trial, was in close proximity to constitute a physical threat to the trial judge, the jurors, his attorney, and his attorney's wife;

(6) the "shock belt" available to the Sweetwater County Sheriff's Office is designed to be worn over clothing, which would make it readily visible to the jury and does not incapacitate the wearer; and

(7) Michael Duke, Duke's brother and federal co-defendant, had been released from federal prison prior to Duke's trial and was residing in Green River, Wyoming.

[¶ 30] In response to the State's argument, Duke argues the trial court erred at the remand hearing when it received in violation of W.R.E. 606(b) juror testimony concerning the effect, if any, on the jury verdict of the jurors' having seen Duke in leg restraints for the eleven days of trial. W.R.E. 606(b) reads:

(b) *Inquiry into validity of verdict or indictment.*—Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received, but a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Duke surmises that the standard of review for the trial court's decision to allow such juror testimony may be the abuse-of-discretion standard, testing that decision as a reviewing court would when a witness's competency is tested. Duke also argues that the reliability of such "after-the-fact" juror testimony is highly suspect. He directs us to the advice of the United States Supreme Court in a case where a procedure is used which involves a probability that prejudice deemed inherently lacking in due process will result, "little stock need be placed in jurors' claims to the contrary." *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). Duke also argues that the evidence against him, particularly with respect to the first degree murder charges and the solicitation-of-murder charges related thereto, was not overwhelming. Duke asserts the verdict on those particular charges turned nearly entirely upon the jury's believing either Duke or the prosecution's key witness Roger Brauberger. Duke argues it is impossible to measure the degree

to which a juror was influenced, consciously or subconsciously, by having seen and heard Duke in leg restraints each and every day of a trial that spanned two weeks; but, he asserts, a prejudicial influence of some weight is presumed.

[¶ 31] The significant facts of this case, in the context of the leg restraints issue, are distinguishable from the significant facts in our prior cases involving leg restraints. In *Asch,* 2003 WY 18, 62 P.3d 945 (Wyo.2003), published February 6, 2003, the remand hearing established that only one juror observed the accused in leg restraints during a one-day trial. *Id.* at ¶ 56. Although we held the trial court abused its discretion in allowing the accused to be shackled in the courtroom during his trial without first requiring the prosecution to justify that practice on the record, *id.* at ¶ 62, we also held the accused's trial counsel had provided ineffective assistance in failing to investigate adequately a primary defense; consequently, we reversed and remanded for a new trial. *Id.* at ¶¶ 65–66. Because of that disposition, we did not undertake a harmless error analysis.

[¶ 32] In *Urbigkit,* 2003 WY 57, 67 P.3d 1207 (Wyo.2003), published May 7, 2003, the accused, before trial and before jury selection, raised the shackling issue, the prosecution opposed the accused's request to be unrestrained in the courtroom during trial, and the trial court allowed the use of leg restraints in the courtroom during the trial. Although no testimony or evidence was presented that the jurors observed the defendant in shackles, the defendant was in leg restraints, and instructed not to move, when he testified before the jury but away from the witness stand. *Id.* at ¶¶ 16–21. We held that the manner in which the trial court resolved the issue generally complied with the spirit of *Asch. Id.* at ¶ 23. We held the trial court did not abuse its discretion in requiring the accused to wear leg restraints in the courtroom throughout his trial. *Id.* at ¶ 24.

[¶ 33] In *Daniel,* 2003 WY 132, 78 P.3d 205 (Wyo.2003), published October 23, 2003, the remand hearing established that the accused was shackled during his trial without the benefit of a pretrial hearing for the pros-

ecution to establish justification for shackling; thus, the trial court abused its discretion in allowing shackling. *Id.* at ¶ 14. The remand hearing also established, however, that the jury did not view or hear the accused in shackles during his trial. *Id.* at ¶ 15. The present case, then, tried before the *Asch* pretrial procedure became required, is the first case before us where most, if not all, of the jurors viewed and heard the accused in shackles during his trial, and no pretrial proceedings were held on the issue.

[¶ 34] In light of our *Asch* discussion about the inherently prejudicial nature of a jury's viewing and hearing an accused in shackles during his trial, we can only hold here that the trial court's allowance of the use of leg restraints on Duke during his trial was an abuse of discretion and, of course, error. Although Duke argues it is impossible to measure the degree of the prejudicial influence his shackling had on the jurors who tried him, we believe it is possible to measure that degree of prejudicial impact considering the weight of the evidence supporting that jury's verdict. Therefore, we hold the trial court's error is subject to harmless error analysis. Applying that analysis, we are impressed by the strong evidence of Duke's guilt on all the charges. That Duke pleaded guilty on the federal charges of soliciting the murder of his parents made his conviction on the similar state charges a certainty. Duke makes no serious argument to the contrary. With respect to the first degree murder charges and the related solicitation charges pertaining to Duke's wife and son, we are also impressed with the strong evidence of Duke's guilt on those charges. We have recounted that evidence earlier in this opinion and need not repeat it here. As that recounting shows, the evidence of Duke's guilt on those charges was much more than a credibility contest between Roger Brauberger and Duke. Quite considerable, and independent, circumstantial evidence existed supporting his guilt on those charges. After carefully studying the record and all of the evidence, we are satisfied beyond a reasonable doubt that the error below was harmless. In reaching this decision, we have giv-

en no stock to the jurors' testimony at the remand hearing. We need not decide today whether, in this shackling context, W.R.E. 606(b) prohibits such testimony. Because of our judgment on the prosecution's strong evidence of Duke's guilt on all of the charges, we had no need to consider the jurors' remand hearing testimony.

**Issue Three: Ineffective assistance of trial counsel**

[¶ 35] Duke has set forth nine claims of alleged ineffective assistance of trial counsel, namely, he (1) failed to object to the joinder of the charges for trial; (2) failed to object to hearsay testimony and unduly prejudicial evidence; (3) failed to adequately investigate; (4) failed to object to leading questions; (5) failed to object to the district court's erroneous application of W.R.E. 613; (6) failed to make a record objection to the security measures employed at trial; (7) failed to object to the use of, and the jury's reliance upon, a demonstrative exhibit that was never introduced into evidence; (8) failed to object to the jury being advised it was a non-capital case; and (9) failed to offer any defense instructions, particularly theory-of-defense instructions.

[¶ 36] Claims of ineffective assistance of counsel are reviewed under the following standard:

> When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo.1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo. 1995); *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796; *Starr*, at 1266; *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of the case." *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064.

*Asch*, at ¶ 11 (quoting *Becker v. State*, 2002 WY 126, ¶ 12, 53 P.3d 94, ¶ 12 (Wyo.2002); *Reyna v. State*, 2001 WY 105, ¶ 19, 33 P.3d 1129, ¶ 19 (Wyo.2001); *Chapman v. State*, 2001 WY 25, ¶ 6, 18 P.3d 1164, ¶ 6 (Wyo. 2001); *Grainey v. State*, 997 P.2d 1035, 1038–39 (Wyo.2000)). The burden of proving that counsel was ineffective rests entirely on an appellant. *Asch*, at ¶ 11 (citing *Barkell v. State*, 2002 WY 153, ¶ 10, 55 P.3d 1239, ¶ 10 (Wyo.2002)). To satisfy his burden, an appellant must provide more than mere speculation or equivocal inferences. *Sincock v. State*, 2003 WY 115, ¶ 37, 76 P.3d 323, ¶ 37 (Wyo.2003) (citing *Barkell*, at ¶ 13).

*Failure to object to the joinder of the cases for trial*

[¶ 37] A few days after Duke's arraignment in Docket No. CR–02–49–R, the State filed a motion to join that case with Docket No. CR–01–209–R for purposes of trial "on the grounds that all counts charged in the two referenced cases include offenses of the same or similar character, and are based upon acts or transactions connected together or constituting parts of a common

scheme or plan." That motion was addressed during a hearing on April 25, 2002. As the State was presenting argument in favor of joinder, the following transpired:

> [Defense Counsel]: Your Honor, I have a question. Is all of this necessary? Are we playing to the press to get our story out, or are we arguing a motion?
>
> [Prosecutor]: Your Honor, I believe I'm required to show that this is a common scheme or plan, and I don't want to go into a lot more detail, but I think I'm required to give you a little bit of an offer of proof so you can see whether or not it was a common scheme or plan.
>
> * * * *
>
> [Defense Counsel]: Try your case. We know what the Judge is going to rule, we talked about it in chambers.
>
> COURT: Well—
>
> [Prosecutor]: If you're going to stipulate to the ruling, I don't need to say anything else.
>
> * * * *
>
> COURT: [Defense counsel], are you opposed to the Motion for Joinder?
>
> [Defense Counsel]: No. I have talked this over with my client, your Honor, and it's my opinion that any evidence is going to come in on either trial, especially the first degree murder charge from the felony convictions if he testifies. I don't believe I can stop that. I realize what they're trying to do is take their weakest case and put it with their strongest case, but in order for my client to testify, I have to basically agree to the joinder, so that's what I'm telling you. I'm not going to object to the joinder. [Duke] understands what I'm doing.
>
> [Prosecutor]: If there's no objection to the joinder, your Honor, I need say nothing else.
>
> COURT: All right. It—is that correct?
>
> [Defense Counsel]: That's correct, your Honor.
>
> COURT: All right. The Motion is granted.

[¶ 38] Duke now scores trial counsel for not contesting the joinder of the two cases for trial. He contends that he was preju-diced by counsel's inactions because the prosecution was erroneously allowed to consolidate two sets of unrelated charges and all of its evidence, including "bad character" evidence, into one trial to his detriment. Duke alleges error but has failed to make the requisite showing that counsel rendered prejudicially deficient assistance.

[¶ 39] The rules pertaining to the joinder of criminal cases are W.R.Cr.P. 8(a) and 13. W.R.Cr.P. 8(a) provides:

> (a) *Joinder of offenses.*—Two or more offenses may be charged in the same citation, indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

W.R.Cr.P. 13 provides in pertinent part:

> The court may order two or more indictments, informations, citations or a combination thereof to be tried together if the offenses ... could have been joined in a single indictment, information or citation. The procedure shall be the same as if the prosecution were under such single indictment, information or citation.

The rule governing the severance of criminal charges is W.R.Cr.P. 14, which provides in pertinent part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses ... in an indictment, information or citation, or by such joinder for trial together, the court may order an election or separate trials of counts ... or provide whatever other relief justice requires.

[¶ 40] Rule 13 conditions the joinder of offenses charged in separate informations or indictments on the same circumstances which would permit joinder of counts within a single information. That is, if the offenses charged in separate informations or indictments are of the same or similar character or constitute part of a common scheme or plan, the offenses may be tried together as

if charged in a single information. The law relative to the joinder of offenses contained in the Information and Indictment against Duke is the same as that applicable to the joinder of the four offenses charged in the Indictment against him. *Tabor v. State,* 616 P.2d 1282, 1284 (Wyo.1980). We note that Duke has not challenged the propriety of combining the murder charges and solicitation charges regarding his wife and child in the same Indictment.

[¶ 41] We believe that the two solicitation offenses charged in the Information, Docket No. CR–02–49–R, are of the "same or similar character" as the two solicitation offenses charged in the Indictment, Docket No. CR–01–209–R, and constituted part of a "common plan or scheme." Although the criminal acts occurred at different times and against different victims, the nature of the offenses and the circumstances surrounding the commission of those offenses were identical. In each instance, Duke actively pursued and offered Roger Brauberger money to kill members of his immediate family and formulated plans by which the murders could be accomplished.

 [¶ 42] As a general rule, joinder of offenses is proper absent compelling reasons for severance. *Bell v. State,* 994 P.2d 947, 955 (Wyo.2000) (citing *Bishop v. State,* 687 P.2d 242, 247 (Wyo.1984)). "Joint trials serve the public interest by expediting the administration of justice, reducing docket congestion, conserving judicial time as well as that of jurors along with avoiding the recall of witnesses to duplicate their performances." *Bell,* at 955 (quoting *Jasch v. State,* 563 P.2d 1327, 1335 (Wyo.1977)). Any prejudice caused by the joinder is weighed against the judicial economies created by joinder. *Bell,* at 955 (citing *Dorador v. State,* 768 P.2d 1049, 1052 (Wyo.1989); *Lee v. State,* 653 P.2d 1388 (Wyo.1982)).

[¶ 43] In *Dorador,* this Court identified a two-part test for determining whether prejudice resulted from the joinder of offenses:

The first is whether the evidence relating to the similar offenses charged would be admissible in a separate trial of each offense. *Tabor,* 616 P.2d at 1284. If the evidence would be admissible, there is no prejudice. If the evidence would not be admissible in separate trials, the trial court should then determine whether the evidence of each crime is "simple and distinct." *Drew v. United States,* 331 F.2d 85, 91 (D.C.Cir.1964). Stated differently, the second consideration is whether the evidence relating to the separate offenses would be so complicated that the jury could not reasonably be expected to separate them and evaluate the evidence properly and individually on each separate charge. *Pote v. State,* 695 P.2d 617 (Wyo. 1985).

*Dorador,* 768 P.2d at 1052.

[¶ 44] Duke acknowledges that the interests of judicial economy militate in favor of joinder. He also acknowledges he bears the burden of showing he would have had a better chance at acquittal had the cases not been tried together. However, in attacking counsel's assistance, he offers only an unsupported assertion that he was prejudiced by the joinder of his criminal cases. He has not provided any analysis applying the *Dorador* two-part test to the facts of this case and, instead, has relegated that task to this Court to undertake under the assumption that prejudice will be found.

[¶ 45] An examination of the record reflects that all of the prosecution's evidence pertaining to the solicitation charges would have been admissible in separate trials under W.R.E. 404(b) to show course of conduct or to show a common plan or scheme. *Bell,* 994 P.2d at 956. Duke's attempted solicitation of Roger Brauberger to kill his wife and child was directly related to the murder charges. His later solicitation of Brauberger to kill his parents was relevant circumstantial evidence to prove his involvement in his wife's and child's murder and, therefore, would have been admissible in the murder case. That evidence was also relevant to explain why Brauberger contacted police and why police reopened the investigation into his wife's and child's deaths. Conversely, the evidence of Duke's solicitation of his wife's and child's murder would have been relevant to the solicitation charges concerning his parents and, therefore, would have been admissible in a separate trial on those charges. Duke clear-

ly has made no showing to the contrary. That the evidence presented at this trial could have been separately introduced had the cases not been joined establishes the lack of prejudice to Duke in this case.

[¶ 46] Furthermore, the issues and proof in each case were relatively simple and not complex. The issue before the jury was whether Duke solicited the murders of his parents, his wife and his child and whether he, in fact, killed his wife and child as alleged during the time periods in question. In Instruction No. 10, the trial court instructed the jury that it had to give separate consideration to each count and the evidence pertaining to it, and that its finding on one count was not to control its verdict as to any of the other charged crimes. Duke has provided no evidence that the jury did not follow the trial court's instruction, and he has not shown that the jury improperly cumulated the evidence in reaching its decision.

[¶ 47] Duke has not established that counsel rendered prejudicially deficient assistance in not objecting to the consolidation of his criminal cases for trial.

*Failure to object to hearsay testimony and unduly prejudicial evidence*

[¶ 48] Duke faults counsel for not objecting to certain hearsay testimony, evidence of his brother's federal guilty plea and other unduly prejudicial evidence. Most of his claim appears to be a continuation of his condemnation of counsel's failure to prevent joinder of the criminal charges, which was addressed above. Duke contends that the admission of that testimony denied him a fair trial. In asserting error, however, he has failed to show that counsel's omissions amounted to prejudicially deficient assistance.

[¶ 49] Duke first argues that various witnesses gave improper hearsay testimony to which counsel should have posed an objection. His argument, however, consists solely of a single paragraph of excerpts of the witnesses' trial testimony, placed in a footnote in his brief, with no analysis or citations to legal authorities. His argument also fails to explain how the admission of that

minimal testimony prejudiced his defense. This Court has stated that it will not consider arguments that are not cogent or supported by citation to pertinent authority. *Eustice v. State*, 11 P.3d 897, 904 (Wyo.2000); *Blumhagen v. State*, 11 P.3d 889, 897 (Wyo.2000). We apply that rule here.

[¶ 50] Duke next claims that counsel should have objected when the prosecutor elicited an admission from his brother and federal co-defendant, Mike Duke, that he had pleaded guilty in federal court to a charge related to the solicitation of their parents' murders. In its direct examination of Mike Duke, the prosecution extensively questioned him about his knowledge of, and his involvement in, Duke's solicitation of Brauberger to kill their parents. Throughout his direct testimony, Mike Duke downplayed the seriousness of the murder plot and testified that the plot was simply a practical joke Duke was playing on Brauberger. At the end of direct examination, the following occurred:

[Prosecutor]. Although it was a joke, you ended up pleading guilty in federal court to this joke, didn't you?

[Mike Duke]. Correct.

[¶ 51] Duke asserts that evidence of Mike Duke's federal guilty plea was inadmissible under *Mazurek v. State*, 10 P.3d 531 (Wyo. 2000), *Ross v. State*, 930 P.2d 965 (Wyo.1996), and *Kwallek v. State*, 596 P.2d 1372 (Wyo. 1979). He insists that counsel's failure to object to that testimony deprived him of his right to have a trial on its own merits and constituted reversible error.

[¶ 52] The State acknowledges that the testimony in question was probably inadmissible under existing Wyoming law. The State, however, disagrees, as do we, that Duke is entitled to reversal of his convictions based solely on the admission of that isolated question and answer. *See Black v. State*, 2002 WY 72, ¶ 36, 46 P.3d 298, ¶ 36 (Wyo. 2002); *Mazurek*, 10 P.3d at 535 (when no objection is raised at trial, reversal is warranted only upon a finding of prejudicial plain error).

[¶ 53] To succeed on his ineffectiveness claim, Duke must show both a deficiency in counsel's assistance and resulting prejudice.

*Asch,* at ¶ 11. With respect to the second prong, he has not provided any insight into how the admission of that testimony adversely affected the outcome of his trial. Rather, he has offered nothing more than an unsupported assertion that prejudicial error occurred. At a minimum, he should have evaluated the prejudicial effect of that testimony under the factors set forth in *Mazurek,* 10 P.3d at 539. He, however, has neither mentioned nor applied those factors within the context of this case. In the absence of a clear showing of actual prejudice resulting from counsel's inactions that would be sufficient to undermine confidence in the outcome of his trial, Duke's ineffectiveness claim cannot be sustained.

■■■ [¶ 54] Duke lastly faults counsel for not invoking some "helpful rules of evidence" to prevent other prejudicial evidence from being introduced at trial. Although not entirely clear, he seemingly faults counsel for not keeping from the jury evidence pertaining to his federal conviction and the tapes and transcripts of the telephone calls between himself and Brauberger upon which the solicitation charges concerning his parents were based. However, other than a generic reference to W.R.E. 403 and W.R.E. 404(b), he has provided no guidance on what "helpful rules of evidence" counsel could have invoked to accomplish the desired result under existing law and the facts of this case. His mere unparticularized speculation and conjecture on what counsel should have done, without more, is insufficient to satisfy his burden of demonstrating that counsel's performance was constitutionally ineffective.

*Failure to adequately investigate*

■■■ [¶ 55] Duke next faults counsel for allegedly failing to interview **any** of the prosecution's witnesses prior to trial. Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. This Court assesses counsel's performance by considering all of the circumstances existing at the time counsel made the investigative decision and applies a heavy measure of deference to counsel's judgments

in this regard. *Asch,* at ¶ 41. A convicted defendant claiming counsel was ineffective bears the burden of demonstrating counsel acted unreasonably and that he was prejudiced by counsel's ineffectiveness. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In doing so, an appellant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066.

■■■ [¶ 56] Duke's contention that counsel failed to interview any of the witnesses is not supported by the record and is speculative at best. This Court will not presume the truth of allegations that are not supported by the record. *Madrid v. State,* 910 P.2d 1340, 1343 (Wyo.1996). In his argument, Duke assumes that counsel did not investigate or interview the witnesses because counsel appeared to meet several prosecution witnesses for the first time at trial. However, counsel may have interviewed the witnesses, without meeting them in person, perhaps by telephone. Or, another attorney or an investigator may have interviewed the witnesses for counsel. An appellant's speculative contentions as to what he believes occurred are not considered by this Court unless they are demonstrated in the record. *Id.; Hayes v. American Nat'l Bank of Powell,* 784 P.2d 599, 601 (Wyo.1989).

[¶ 57] Moreover, Duke provides no authority that counsel must meet and interview all of the prosecution's witnesses in person in order to act as reasonably competent counsel and does not explain what "solid investigation of all important witnesses" might entail. Although this Court has acknowledged that a failure to investigate under certain circumstances may constitute ineffective assistance of counsel, none of those circumstances apply in this case. *See Asch,* ¶¶ 41, 43, 45 (regarding failure to investigate a possible defense, failure to identify favorable evidence or witnesses that additional investigation would have revealed, failure to interview an eyewitness to the crime, or failure to investigate evidence that goes to the very heart of the prosecution's case). An appellant must provide more than mere speculation or equivocal inferences to satisfy the burden of demon-

strating that counsel's performance was ineffective. *Sincock*, at ¶ 37. Duke's purely conjectural allegations concerning whether counsel interviewed, or should have interviewed, the prosecution's witnesses simply do not support a claim of ineffective assistance of counsel. He has not demonstrated that counsel's performance was other than reasonable or that he was prejudiced by the alleged failure of counsel to interview the witnesses.

[¶ 58] The majority of Duke's argument faults counsel for allegedly failing to interview Mrs. Brauberger, the wife of the prosecution's main witness. This claim fails because it is not supported by the record. His claim that counsel did not try to talk with Mrs. Brauberger misreads the record. Counsel spoke with Mrs. Brauberger before trial, and she told him to contact the prosecuting attorney. Apparently, she was not willing to provide him with any information and any attempt to interview her or to call her as a witness to impeach her husband would have been futile. Indeed, when the trial court offered to make her available for questioning so counsel could determine whether she did have any relevant impeachment testimony, Duke told counsel not to talk to her. He cannot now complain that counsel was ineffective when counsel simply followed his direction. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066; *Frias*, 722 P.2d at 145.

[¶ 59] In speculative fashion, Duke also alleges that if counsel had interviewed Mrs. Brauberger, counsel could have been prepared for Roger Brauberger's "damning" testimony that he had "previous[ly]" told his wife about Duke's request that he kill his wife and child. According to Duke, this testimony was contradicted by the fact he "twice omitted naming his wife as one of his early confidantes about this murder for hire solicitation" later in his testimony. Duke claims counsel might have been able to impeach Roger Brauberger's testimony by putting Mrs. Brauberger on the stand. However, Duke misinterprets the word "previous" in the above-referenced testimony as indicating Mrs. Brauberger was one of Roger Brau-

berger's "early confidantes" about the murder for hire solicitation.

[¶ 60] Duke's assertion derives from the fact that, at trial, Roger Brauberger explained why he finally went to the police with the information about Duke. He said, "Well, I hadn't told my wife about it until one night when we were driving home...." He then continued:

I said, "Something really bad and terrible has happened and something really bad and terrible might happen if I don't do something about this." So I told her exactly what we [Duke and Roger Brauberger] talked about, about killing his parents. I told her previous about the wife and child. I said, "Look, he's capable of doing it. If I don't go to the police, something— we may end up, you know, seeing another funeral, and I can't deal with that." She advised me to go to my father. My father advised me to go to the police.

[¶ 61] Roger Brauberger talked to the police the next day, January 4, 1999. Contrary to Duke's characterization of this testimony as an indication that Mrs. Brauberger was an early confidante, Roger Brauberger was discussing what he told his wife the night of January 3, 1999. He told her for the first time about Duke's **previous** request to kill Erik and Liana Duke to explain why he was concerned about Duke's request to kill his parents. Not only was counsel's investigation reasonable, but Duke has not demonstrated prejudice because there was no discrepancy in Roger Brauberger's testimony.

[¶ 62] Duke also complains that the alleged failure to interview witnesses deprived counsel of the ability to determine whether they might have information that could have shaken the jury's confidence in Roger Brauberger. This argument ignores the testimony that the jury did hear about Roger Brauberger. Defense counsel cross-examined Roger Brauberger and delved into his drug and heavy drinking habits and that he bought and sold marijuana. Counsel noted that Roger Brauberger did not remember many details and contradicted himself in other ways. Duke also testified that it was Roger Brauberger's idea to kill Duke's parents. Defense counsel presented a formida-

ble attack on Roger Brauberger's credibility, and Duke has not demonstrated that counsel's performance fell below that of a reasonably competent counsel. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

[¶ 63] Considering the speculative nature of Duke's claims that counsel did not interview any of the prosecution's witnesses, he has not demonstrated that counsel failed to investigate or any alleged failure to interview witnesses was unreasonable. Nor has he demonstrated any prejudice resulting from counsel's alleged failure to investigate.

*Failure to object to leading questions*

[¶ 64] Duke complains that counsel did not object when the prosecutor asked leading questions of the prosecution's witnesses on direct examination. However, he acknowledges that "it is sometimes unwise, time-consuming and even annoying to the court to pose technically correct objections to things which don't matter" and does not even attempt to distinguish this case from a case in which counsel is wise to avoid annoying the court and the jury with needless objections. Although Duke calls the challenged testimony "highly consequential," he does not explain why the testimony was so important. If the testimony was important, counsel may have made a conscious and reasonable choice not to draw the jury's attention to that testimony with an objection when the information would have gotten to the jury eventually anyway. Duke has not "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (internal quotation marks omitted).

[¶ 65] In addition, "[l]eading questions are not, per se, impermissible." *Pena v. State,* 792 P.2d 1352, 1355 (Wyo.1990). W.R.E. 611(c) states that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." Duke does not assert that the questions were not necessary to develop the witnesses' testimony. As such, counsel's decision not to object was entirely proper.

[¶ 66] Duke's comment that leading questions "may influence testimony, invoke a false memory of events or push a witness into false acquiescence to the questioner" is not sufficient to support a claim of ineffective assistance of counsel. Such speculation and conjectural allegations do not demonstrate that counsel's performance was not reasonable or affirmatively prove that Duke was prejudiced. *Sincock,* at ¶ 37. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

*Failure to object to the district court's erroneous application of W.R.E. 613*

[¶ 67] Duke apparently contends that counsel was ineffective for his failure to object to the trial court's allegedly erroneous application of W.R.E. 613 to counsel's attempts at impeaching Roger Brauberger. However, Duke does nothing to develop or analyze this claim. Rather, he merely cites to three pages of the trial transcript and the language of Rule 613 and leaves it to the State and to this Court to determine what his complaint entails. Furthermore, Duke has not explained how counsel's alleged deficiency in this regard actually prejudiced him at trial. Because his claim is not supported by cogent argument or legal authority, this Court need not consider it. *Barkell,* at ¶ 32; *Madrid,* 910 P.2d at 1347.

*Failure to make a record objection to the security measures employed at trial*

[¶ 68] Duke faults counsel for not objecting to the use of restraints at trial. He, however, has not provided any argument concerning this claim but, rather, has simply directed the Court's attention to Argument II of his brief. As we explained in response to that claim, no reasonable possibility exists that the jurors' observation of Duke in re-

straints during trial contributed to their determination of guilt. Because his right to a fair trial was not adversely affected by the shackling, he cannot show that counsel rendered prejudicially deficient assistance in not making a record objection to the use of restraints during trial.

*Failure to object to the use of, and the jury's reliance upon, a demonstrative exhibit that was never introduced into evidence*

[¶ 69] Duke contends that counsel should have objected to the use of a demonstrative exhibit representing the cliff where his wife and son died. However, he fails to support with pertinent analysis his assertions that the exhibit was "inflammatory" and "prejudicial." He fails to explain how the demonstrative exhibit could be deemed either "inflammatory" or "prejudicial" in this case, especially given that both the prosecution and the defense witnesses used the exhibit during the trial. The facts of the cases he relies upon to argue that the exhibit was prejudicial are easily distinguishable from those of his case. In each of those cited cases, the challenged exhibit was inadmissible and provided direct evidence of guilt or was patently inflammatory—those exhibits included, for example, transcripts of a defendant's drug deals and a jar containing the flesh and skin of the deceased. The model of the cliff, however, did not directly evidence Duke's guilt and could have been admitted into evidence because it was relevant to a matter of consequence at Duke's trial.

[¶ 70] Relevant evidence is evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. The cliff model was used to aid the jury in understanding the testimony of many of the witnesses, including defense witnesses. Consequently, both the defense and the prosecution benefited from the use of the large model. Duke simply cannot meet his burden of demonstrating counsel's actions were unreasonable or he was in any way prejudiced by the use of the model.

[¶ 71] When the jury asked to see the model of the cliff in the jury room, Duke told defense counsel that he did not object to allowing the jury to look at the model. Being careful to make a clear record, the prosecutor explained that he did not offer the exhibit into evidence because of its weight and size. The model was approximately four feet by five feet and weighed about 200 pounds. The court reporter would not be able to store it as an exhibit and it would be too cumbersome to transport for an appeal. The trial court found that approximately fifteen witnesses referenced the model during their testimony and that it would be helpful to the jury to be able to look at the model during deliberations. The court also noted that it would not have allowed the jury to look at the non-exhibit during deliberations if the jury had not asked for it and it had not been approved by both parties. *See Worcester v. State*, 2001 WY 82, ¶¶ 10, 12, 30 P.3d 47, ¶¶ 10, 12 (Wyo.2001) (although it is error to send into the jury room items not admitted into evidence, the fact that both parties utilized the models indicates the error was not prejudicial). *Cf. Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir.1985), cited with approval in *Worcester*, at ¶ 10 (visual aids may be used by jury during deliberations when the parties consent).

[¶ 72] Duke does not argue that counsel's actions were unreasonable under the circumstances or that the use of the exhibit "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064. Obviously, Duke believed the model was helpful to his rendition of the facts and proof of his innocence. Therefore, the use of the model was sound trial strategy. The jury also visited the cliff site during the trial, and Duke recognizes the model was probably redundant to the site visit. He does not explain how he could possibly be prejudiced by this redundant, but obviously useful, information. Absent a demonstration that counsel failed to render such assistance as would have been offered by reasonably competent counsel or that Duke was prejudiced by the failure to object to the jury's use of the demonstrative exhibit during deliberations,

this ineffective assistance of counsel claim must also fail.

*Failure to object to the jury being advised that it was a non-capital case*

[¶ 73] After the exercise of peremptory challenges with respect to the twelve jurors empaneled to sit on Duke's case, but before the selection of the two alternate jurors, the following transpired during voir dire:

> COURT: * * * Do you think you—do you need to tell these people that this is not a death penalty case? You keep talking about the punishment is up to the Judge, the punishment is up to the Judge.
>
> [Prosecutor]: I would ask that you instruct them it's not a death penalty case.
>
> COURT: Well, okay. . . .
>
> * * * *
>
> One other thing, the—it's been mentioned that the Judge makes decisions on punishment, and even though there are some murder charges that have been filed in this case, this is not a death penalty case, so I hope no one thinks that that is the case.

[¶ 74] Duke now faults counsel for not objecting to the court's decision to inform the jury that the case was a non-capital case. He, however, has failed to offer any legal basis upon which counsel could have posed a successful objection to the court's advisement. That is, he has not identified any legal authority indicating that it was improper for the court to inform the jury during voir dire that the death penalty was inapplicable to his case. In this regard, it should be noted that other jurisdictions have acknowledged the propriety of such an advisement in murder cases. *See State v. Townsend,* 97 Wash.App. 25, 979 P.2d 453, 456–57 (1999); *State ex rel. Schiff v. Madrid,* 101 N.M. 153, 679 P.2d 821, 824 (1984). Absent some basis in law to support his claim, Duke cannot show that counsel's omission fell outside the range of professionally competent assistance.

[¶ 75] Moreover, Duke has not explained how counsel's failure to object to the court's advisement adversely affected the outcome of his trial. As noted above, Duke bears the burden of demonstrating both a deficiency in counsel's assistance and resulting prejudice. *Asch,* at ¶ 11. Because he has failed to identify any prejudice resulting from counsel's inaction, he cannot satisfy that burden and his ineffectiveness claim fails.

*Failure to offer any defense instructions, particularly theory of defense instructions*

[¶ 76] Duke scores counsel for allegedly failing to offer any defense instructions. Specifically, he faults counsel for not offering any theory of defense instructions with respect to the murder charges, including "some sort of instruction on accident" or some lesser included offense instructions; and not offering any instructions, beyond one dealing with renunciation, in defense of the solicitation charges. He also criticizes counsel for not having the jury instructed about the meaning of "purposely" and "premeditated malice." His contention fails for several reasons.

[¶ 77] First, the record in this case clearly belies his contention that counsel failed to ensure that the jury was instructed concerning the terms "purposely" and "premeditated malice." Instruction No. 25 informed the jury that "purposely" meant intentionally. Additionally, "premeditated malice" was defined for the jury by Instruction No. 26:

> "Premeditated malice" means that the Defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse.
>
> "Premeditated" implies an interval, however brief, between the formation of the intent or design to kill and the commission of the act which results in death.

Duke has neither alleged, nor has he shown, that those instructions were an incorrect statement of existing law. Given the fact that the jury was properly instructed on the terms at issue, Duke's ineffectiveness claim in this regard is without merit.

[¶ 78] Second, Duke has not identified with any specificity the theory of defense

instructions that counsel was remiss in not promoting. He contends that some sort of accident instruction should have been given in defense of the murder charges but has failed to explain what such an instruction would have entailed under the facts of this case. Instead, he has simply chosen to vaguely reference a comment by this Court in *Holloman v. State*, 2002 WY 117, 51 P.3d 214 (Wyo.2002), to assert that counsel was derelict in his duties. In the absence of a cogent argument and citations to pertinent legal authority, his contention in this respect must be rejected. *Barkell*, at ¶ 32.

[¶ 79] Third, Duke's contention that counsel was ineffective for not offering instructions to defend against the solicitation charges is likewise devoid of a cogent argument and citations to pertinent legal authority. He bears the burden of proving that counsel's assistance was prejudicially deficient, and his unsupported suggestion—that counsel could have offered "an instruction prohibiting multiple convictions for a single solicitation with more than one victim[,] an instruction that the act of solicitation and necessary intent are not concurrent, and possibly many others"—is insufficient, without more, to satisfy that burden.

[¶ 80] Finally, Duke has not provided any insight regarding the lesser included offense instructions counsel should have offered relative to the murder charges considering his "I didn't do anything" trial defense. As shown by the record, Duke defended against those charges on the theory that his wife and child slipped and fell from a cliff while he was getting something from his vehicle. Thus, Duke denied any wrongful conduct and maintained that his wife's and child's deaths were simply the product of an unfortunate accident in which he played no part. Therefore, choosing from the facts presented at trial, the jury was left with only two alternatives—finding Duke guilty of first degree murder or not guilty. There was no evidence from which the jury rationally could have acquitted Duke on the first degree murder charges and convicted him on any lesser included offenses: for example, second degree murder or voluntary manslaughter. As recently reiterated by this Court, where the facts and the defense are such that a defendant, if guilty at all, is guilty of the greater offense, a defendant is not entitled to a lesser included offense instruction. *Dean v. State*, 2003 WY 128, ¶ 34, 77 P.3d 692, ¶ 34 (Wyo. 2003) (collecting cases). Consequently, counsel cannot be deemed ineffective for failing to pursue lesser included offense instructions with respect to the murder charges—instructions that Duke was not legally entitled to and which would have, most likely, been refused by the trial court based on the facts of the case. *See Herdt v. State*, 891 P.2d 793, 799 (Wyo.1995) (ineffectiveness cannot be premised on counsel's failure to seek relief which is not available to him).

[¶ 81] Duke has failed to sustain his burden of proving that he was deprived of his constitutional right to the effective assistance of counsel. Throughout his trial, defense counsel vigorously represented his client and challenged the prosecution's evidence. Duke has not demonstrated that counsel's performance was outside the range of professionally competent assistance, nor has he shown that the outcome of his trial would have been different absent attorney error. That the jury found Duke guilty does not entitle him to prevail on his ineffectiveness claim.

**Issue Four: Sufficiency of the evidence to sustain convictions for first degree murder**

[¶ 82] Duke contends that his first degree murder convictions cannot stand because the prosecution failed to provide sufficient evidence that he killed his wife and son and he did so with premeditated malice. This Court's standard for reviewing sufficiency of the evidence claims is well settled:

> "When reviewing a sufficiency of the evidence claim in a criminal case, we must determine whether a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. We do not consider conflicting evidence presented by the unsuccessful party, and afford every favorable inference which may be reasonably and fairly drawn from the successful party's evidence. We have consistently held that it is the jury's responsibility to resolve conflicts in the evidence. 'We will not substitute our judg-

ment for that of the jury, ... our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did.' " [*Bloomquist v. State*, 914 P.2d 812, 824 (Wyo. 1996)].

*Urbigkit*, at ¶ 44 (quoting *Williams v. State*, 986 P.2d 855, 857 (Wyo.1999) (alterations in original)).

[¶ 83] Duke was charged with two counts of first degree premeditated murder, in violation of Wyo. Stat. Ann. § 6–2–101(a). Consequently, the prosecution had the burden of proving beyond a reasonable doubt that, on or about the 10th day of August, 1996, in Sweetwater County, Wyoming, Duke purposely and with premeditated malice killed Liana Mae Duke and Erik Robert Duke.

[¶ 84] In *Bouwkamp v. State*, 833 P.2d 486, 493 (Wyo.1992), this Court reiterated the meaning of premeditation:

> [Premeditation] is the "thinking over, deliberating upon, weighing in the mind beforehand, resulting in a deliberate intention to kill which constitutes the killing murder in the first degree." *Parker v. State*, 24 Wyo. 491, 502, 161 P. 552, 555 (1916). Premeditation may be inferred from the facts and circumstances. *Murry v. State*, 713 P.2d 202, 206 (Wyo.1986); *Goodman v. State*, 573 P.2d 400, 407 (Wyo. 1977).

"Premeditation need not have existed for any given length of time before the act, it being sufficient that it existed at the time of the act; and the intent and the act may be as instantaneous as successive thoughts." *Young v. State*, 849 P.2d 754, 761 (Wyo.1993) (quoting *Murry*, 713 P.2d at 207).

[¶ 85] In *Bouwkamp*, this Court adopted a three-part test for determining whether the trial evidence was sufficient to sustain a verdict of premeditated murder:

> Evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories: (1) facts about * * * what a defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3) would * * * support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed'; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take [the] victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."
>
> *People v. Crandell*, 46 Cal.3d 833, 760 P.2d 423, 441, 251 Cal.Rptr. 227 (1988) (quoting *People v. Anderson*, 70 Cal.2d 15, 447 P.2d 942, 949, 73 Cal.Rptr. 550, 557 (1968)) (citations omitted).
>
> [V]erdicts of first degree murder typically [are sustained] when there is evidence of all three types and otherwise require at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).
>
> *People v. Anderson*, 70 Cal.2d 15, 447 P.2d at 949, 73 Cal.Rptr. at 557.

*Bouwkamp*, 833 P.2d at 494–95 (emphasis and alterations in original).

[¶ 86] As shown in more detail in the General Background Facts portion of this opinion, the jury had before it sufficient evidence from which it could reasonably conclude that Duke purposely and with premeditated malice killed his wife and son on August 10, 1996. The jury heard evidence that Duke wanted his wife and son dead. Within a few months before their deaths, Duke actively pursued Roger Brauberger to kill them. He initially offered Brauberger $15,000, and later agreed to pay him $23,000 to do the job. Duke suggested a plan by which the killings could be accomplished and divert suspicion away from him. That evi-

dence supports a reasonable inference that Duke was "engaged in activity directed toward and explicable as intended to result" in the killing of his wife and child. That Duke planned to kill them is further supported by evidence that he initiated that fatal trip, he took them to an isolated area he had been to on prior occasions, and he gave varying and conflicting accounts of the events surrounding their deaths.

[¶ 87] With respect to the second category in the *Bouwkamp* analysis, the jury heard evidence about Duke's relationship with his wife and child that suggests a motive or motives to murder them. That evidence revealed that he was less than a faithful and loving husband and father. The evidence indicated that he was verbally abusive toward them and had been involved with other women during the marriage. It also revealed that he was cold toward his child and never really bonded with him. The jury also heard evidence that Duke was looking for a way out of the marriage, other than divorce, which would enable him to avoid a long-term child support obligation. The jury further heard that, approximately two weeks after their deaths, Duke collected $60,000 in life insurance proceeds. From that evidence, the jury could reasonably have inferred that he killed his wife and son to obtain his freedom from an unwanted relationship. The jury could also have inferred greed as a motivating factor to kill, whether it was Duke's desire to avoid the monetary obligation of child support or to get the proceeds of their life insurance policies. That greed was the motivating factor to kill could also be inferred from Duke's attempts to hire Brauberger to kill his parents, murders which would have resulted in a substantial monetary gain for him. Those motives, coupled with his planning activities, are certainly sufficient to justify an inference of premeditation.

[¶ 88] Regarding the final category, the jury was presented with evidence that his wife and son suffered a tragic death. Both died from injuries sustained during a fall down the face of a two hundred foot rocky cliff. The prosecution's theory at trial was that Duke intentionally took his wife and son to that cliff, which was located in an isolated area miles from the nearest town, pushed them over the edge of the cliff, and made sure they were dead before notifying the authorities. Consequently, there was evidence of all three aspects of the *Bouwkamp* analysis from which the jury could reasonably infer that Duke purposely and with premeditated malice killed his wife and child.

## Issue Five: Jury instructions

[¶ 89] Duke claims that the trial court's jury instructions impermissibly allowed the jury to convict him if it concluded that "any" rather than "all" of the elements of the murder charges were proved beyond a reasonable doubt. Consequently, he insists that his murder convictions should be reversed with "prejudice to retrial."

[¶ 90] It is well settled that a trial court has a duty to instruct a jury regarding the general principles of law applicable to the case. *Black v. State*, 2002 WY 72, ¶ 5, 46 P.3d 298, ¶ 5 (Wyo.2002). On appellate review, jury instructions must be considered as a whole, and individual instructions, or parts thereof, should not be singled out and considered in isolation. *Id.; Brown v. State*, 2002 WY 61, ¶ 9, 44 P.3d 97, ¶ 9 (Wyo.2002); *Ogden v. State*, 2001 WY 109, ¶ 8, 34 P.3d 271, ¶ 8 (Wyo.2001). A trial court is given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the instructions in their entirety sufficiently covers the relevant issue, reversible error will not be found. *Black*, at ¶ 5; *Brown*, at ¶ 9; *Ogden*, at ¶ 8. The accuracy of an instruction is a question of law which is reviewed *de novo*. *Williams v. State*, 2002 WY 136, ¶ 11, 54 P.3d 248, ¶ 11 (Wyo.2002).

[¶ 91] When, as in this case, no objection is raised at trial to the jury instruction at issue, the plain error standard of review applies, which requires that: (1) the record clearly reveal the alleged error without resort to speculation; (2) appellant demonstrate a violation of a clear and unequivocal rule in an obvious, not merely arguable, way; and (3) appellant prove that he was denied a substantial right resulting in material prejudice. *Reilly v. State*, 2002 WY 156,

¶ 15, 55 P.3d 1259, ¶ 15 (Wyo.2002); *Williams*, at ¶ 12; *Brown*, at ¶ 10; *Ogden*, at ¶ 9.

[¶ 92] At issue in this case is the propriety of the trial court's elements instructions concerning the first degree murder counts involving the wife and child. With respect to those charges, the record shows that the trial court instructed the jury as follows:

## INSTRUCTION NO. 17

The elements of the crime of Murder in the First Degree, as charged in Count I of the Indictment in this case, are:

1. On or about the 10th day of August, 1996;

2. In Sweetwater County, Wyoming;

3. The Defendant, JAMES ROBERT DUKE;

4. Purposely; and

5. With premeditated malice;

6. Killed a human being, Erik Robert Duke

If you find from your consideration of all the evidence that any of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that each of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

The language of Instruction No. 18, as given to the jury, was identical to that contained in Instruction No. 17, except for indicating that it concerns Count II of the Indictment and the wife's name is referred to instead of the child's.

[¶ 93] Duke contends that the second prong of the plain error doctrine has been satisfied because both jury instructions impermissibly permitted the jury to find him guilty of murder if it found "any" of the listed elements. He claims that such violated the clear and unequivocal rule of law that "each" and "every" essential element of charged crime be proved beyond a reasonable doubt. Duke has singled out a portion of those jury instructions and considered it in isolation in asserting error. However, when those instructions are viewed in their entirety, and in conjunction with the trial court's other instructions, Duke cannot show that a violation of a clear rule of law occurred warranting reversal of his murder convictions.

[¶ 94] Admittedly, the first degree murder jury instructions indicated that if the jury found any of the six elements were proved beyond a reasonable doubt, it could find Duke guilty. However, in the next paragraph of the instructions, the jury was instructed it must find Duke not guilty if it found each of the six elements had not been proved beyond a reasonable doubt. Black's Law Dictionary defines the word "each" as synonymous with "all" and equivalent to "any." It also denotes "each" as "every one of the ... things mentioned." Black's Law Dictionary 507 (6th ed.1990). Therefore, the latter paragraph of the instructions told the jury that it must find Duke not guilty if it determined the prosecution had not proved all six elements beyond a reasonable doubt.

[¶ 95] Assuming arguendo there was error in those instructions, this Court has held that "[a]n error in one jury instruction may be cured elsewhere in the jury instructions by conveying correct information to the jury in a clear and concise manner so that it is unlikely that an erroneous impression would remain in the minds of the jurors." *Christian v. State*, 883 P.2d 376, 379 (Wyo.1994) (citing *Vigil v. State*, 859 P.2d 659, 663 (Wyo.1993)). When considering whether a jury may have been confused or misled by a jury instruction, the instructions are reviewed in their entirety and read together. *Rigler v. State*, 941 P.2d 734, 740 (Wyo.1997) (citing *Baier v. State*, 891 P.2d 754, 756 (Wyo.1995)).

[¶ 96] If the jury was confused by the misstatement in Instruction Nos. 17 and 18, Instruction Nos. 7, 8 and 9 clearly described the jury's task. *Rigler*, 941 P.2d at 741. The other instructions given by the trial court made it clear that the jury was required to find that the prosecution proved each of the elements in the first degree murder instructions beyond a reasonable doubt. Instruction No. 7 informed the jury, in pertinent part, that:

If in these instructions any rule, direction or idea be stated in varying ways, no emphasis thereon is intended, and none must be inferred by you. For that reason, you are not to single out any certain sentence, or any individual point or instructions, and ignore the others, but you are to consider all the instructions as a whole, and are to regard each in the light of all the others.

Instruction No. 8, the presumption of innocence instruction, informed the jury, in pertinent part, that:

The law raises no presumption against the defendant but rather, the presumption of law is in favor of his innocence. In order to convict the defendant of the crime charged, every material and necessary element to constitute such crime must be proved beyond a reasonable doubt and if the jury has a reasonable doubt on any necessary element, it is your duty to give the benefit of such doubt to the defendant and acquit him.

Instruction No. 9 told the jury:

The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence on the question of guilt or innocence. The burden is always on the State to prove the defendant's guilt beyond a reasonable doubt as to each element of the offense.

[¶ 97] Additionally, Instruction Nos. 19 through 22, the elements instructions pertaining to the solicitation charges, told the jury it could not find Duke guilty of those charges unless it found each element of the offense had been proved beyond a reasonable doubt. Moreover, the prosecution reminded the jury during closing arguments that each and every element of the charged crimes had to be proved beyond a reasonable doubt:

Now, the Court has just read you the elements of those crimes, instructed you on those....

\* \* \* \*

When you view all of the evidence as has been presented to you and apply the law that the Court has given you, you will find beyond a reasonable doubt that the Defendant committed each and every element of each crime charged.

[¶ 98] Considering the arguments of counsel and all of the jury instructions given, Duke has not met the stringent burden under the plain error standard of showing that the jury was misled into believing that it could convict him of first degree murder if it found the prosecution proved any one of the elements of first degree murder beyond a reasonable doubt. *Taylor v. State*, 2001 WY 13, ¶ 18, 17 P.3d 715, ¶ 18 (Wyo.2001). We do not find that the jury was left with the erroneous impression that it could find Duke guilty of first degree murder if the prosecution merely proved his name was James Robert Duke. *See Christian*, 883 P.2d at 379–80. A reasonable juror would not have considered the instruction as allowing a conviction of first degree murder upon a finding of only one of the elements contained therein, as Duke suggests. *Ellison v. State*, 3 P.3d 845, 849 (Wyo.2000). Therefore, Duke's argument fails.

**Issue Six: Prosecutorial comment during closing argument**

[¶ 99] Duke contends that he was denied a fair trial because the prosecutors impermissibly injected their personal beliefs as to his credibility by belittling his trial testimony and repeatedly telling the jury that he lied. With respect to claims of prosecutorial misconduct, this Court has stated:

Prosecutorial misconduct "has always been condemned in this state." *Earll v. State*, 2001 WY 66, ¶ 9, 29 P.3d 787, ¶ 9 (Wyo. 2001) (quoting *Valerio v. State*, 527 P.2d 154, 156 (Wyo.1974)). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. "Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Earll*, at ¶ 9.

*Simmons v. State*, 2003 WY 84, ¶ 15, 72 P.3d 803, ¶ 15 (Wyo.2003) (quoting *Williams*, at ¶ 21); *see also Wilks v. State*, 2002 WY 100, ¶ 26, 49 P.3d 975, ¶ 26 (Wyo.2002); *O'Brien v. State*, 2002 WY 63, ¶ 35, 45 P.3d 225, ¶ 35 (Wyo.2002).

[¶ 100] Claims of prosecutorial misconduct are settled by reference to the entire record and hinge on whether the accused's case has been so prejudiced as to constitute the denial of a fair trial. *English v. State*, 982 P.2d 139, 143 (Wyo.1999) (quoting *Gayler v. State*, 957 P.2d 855, 860 (Wyo. 1998); *Arevalo v. State*, 939 P.2d 228, 230 (Wyo.1997)). The propriety of any comment within a closing argument is judged "in the context of the prosecutor's entire argument, considering the context of the statements and comparing them with the evidence produced at the trial." *Wilks*, at ¶ 26 (citing *Burton v. State*, 2002 WY 71, ¶ 11, 46 P.3d 309, ¶ 11 (Wyo.2002)). The burden of proving prejudicial error rests with the appellant. *Wilks*, at ¶ 26; *see also Taylor*, at ¶ 19; *Tennant v. State*, 786 P.2d 339, 346 (Wyo.1990).

[¶ 101] Where, as in this case, no objection is raised at trial to the prosecutor's alleged misconduct, the standard of review is plain error, which demands:

First, the record must be clear as to the incident which is alleged as error. Second, the party claiming the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove a substantial right has been denied him and, as a result, he has been materially prejudiced.

*Wilks*, at ¶ 7 (quoting *Worcester*, at ¶ 7).

[¶ 102] Duke identifies several isolated comments by the prosecutors during closing and rebuttal closing arguments and asserts that they were improper and constituted misconduct. As noted above, Duke did not object to those comments and, therefore, bears the burden of demonstrating plain error in order to succeed on his claim.

[¶ 103] The first element of the plain error standard is satisfied because the record clearly reveals the alleged misconduct. Following are the prosecutors' remarks in the context in which they were made during closing and rebuttal closing arguments (emphasis added):

Let's look for a few minutes, ladies and gentlemen, to the Defendant's statements made to various witnesses about the events of August 1996.

\* \* \* \*

Dawn Gunter, her husband, the cliff gives way. That's May or June of 1998. He can't get down. His son is wheezing blood. Here's a new one. He spends the time waiting for the ambulance doing what? Picking up the rest of the toys. That's what he tells Dawn Gunter.

It goes on, ladies and gentlemen, and **we know, of course, that his statements to Mr. and Mrs. Gunter are lies.** The rocks did not give away. Dr. Miller told you those rocks had not been disturbed for 30 to 40 years.

. . . **We know the Defendant lied about the cliff giving way, just like we know the Defendant would lie about putting a lattice up on the Anvil Street Apartments.** The owner of those apartments came in and talked to you and told you that that lattice went up by the current resident last year, not by the Defendant years ago.

**The Defendant would lie to help himself. He will lie about ever even seeing Cynthia Smith,** the federal court officer who certainly remembered him, whose job it was to interview him to make a report and a recommendation to a judge. Now, why would he deny her existence? Because he told her in Texas in 1999, he thinks he's safe in Texas, he's a long ways away from here, his wife had died in an accident following an argument, and then he even denies the existence of his son. What possible reason would Ms. Smith, a court officer, have perjuring herself in front of you?

The one thing that he was consistent in was this lie about not being able to get down to the bodies. He told everybody that. He told them that from the very start, on and on and on, and yet, **he knew every time he told that lie that it was a lie,** because he had seen the EMTs walk down there, he had seen the firemen walk

down there, he had seen them walk back up carrying the dead bodies of his family, and yet, he continued to say to everybody, even after seeing that, "I couldn't get down. There's no way. It was too steep. I couldn't do it." He kept that lie up for years.

**But then, of course, he's already told you that he'll do whatever it takes to get himself the best deal possible, to help himself, and that would include telling a federal district judge a story to get a good deal, and so imagine what he would tell you in the situation he's in now.**

\* \* \* \*

Let me ask you this—think about this. You know, the State, we can tell Crystal Carter to commit perjury, and apparently she will, and if we—if we can do that and with all our great resources and all our great power that he likes to talk about, we can tell Roger to lie and he'll say whatever we want to hear, how come if [Duke's] whole thing depends upon him telling you that he had never been to the top of that cliff before, how come Roger didn't testify to that? Because when we asked Roger whether he had been up there before with [Duke], he said, "I can't be sure. Maybe we were, maybe we weren't. I can't be sure." Dayton took him out there to see if he could be sure, and he comes back under oath and he says, "I can't be sure." If we can force everybody to say whatever we want them to say, how come our main witness doesn't help us on a critical point in the case? I would submit to you because it's one of two things; either Crystal's lying and practically everyone else that we called is either lying or mistaken, and so that would entail a lot of different people coming in with no real motivation to subject themselves to penalty of perjury, telling lies on the Defendant, or the other explanation is the Defendant is lying, and **I would submit to you that you have all the evidence in the world to conclude beyond a reasonable doubt that he is, in fact, lying.**

[¶ 104] However, when the prosecutors' comments are viewed in their entirety and in

the context of the entire trial, it is clear that the second element of the plain error analysis, the requirement to show a violation of a clear and unequivocal rule of law, has not been satisfied. The State argues that, by making those statements, the prosecutors were not attempting to induce the jurors to base their factual determinations on the prosecutors' personal beliefs or opinions, as Duke suggests. Rather, the State continues, the prosecutors were merely pointing out that the evidence and the testimony of the prosecution's witnesses contradicted that of Duke and expressing the prosecution's position upon inferences to be drawn from that testimony and the other evidence presented at trial. We agree. Argument of this nature is not erroneous but has been sanctioned by decisions of this Court. *Beaugureau v. State*, 2002 WY 160, ¶ 14, 56 P.3d 626, ¶ 14 (Wyo.2002); *Dike v. State*, 990 P.2d 1012, 1025–26 (Wyo.1999); *Barela v. State*, 787 P.2d 82, 83–84 (Wyo.1990). In *Dike*, this Court declared:

> This Court has held that the purpose of closing arguments is to afford counsel the opportunity to explain the significance of the evidence and how it should be viewed by the jury. *Harper v. State*, 970 P.2d 400, 403 (Wyo.1998). During closing arguments, counsel may assist the jury by reflecting upon the evidence and drawing reasonable inferences that logically flow from the evidence. *Gayler*, 957 P.2d at 861. When the jury is presented with contradictory testimony, counsel is allowed to communicate the reasonable inference that one of the witnesses is lying. *Barela v. State*, 787 P.2d 82, 84 (Wyo.1990).

*Dike*, 990 P.2d at 1026.

[¶ 105] Duke recognizes the force of the holding in *Dike* but urges this Court to overrule that decision. He complains that to call a witness a liar is "inflammatory and prejudicial" and suggests that closing arguments be limited to observations that "someone was not being completely accurate," which "would be a reasonable inference." However, we shall not abandon the *Dike* rule, which was based on this Court's decision in *Barela*, 787 P.2d at 83–84, and which has since been reaffirmed in *Beaugureau*, at ¶ 14.

[¶ 106] The issue to be decided in this case is whether the prosecutors' comments amounted to plain error. Duke cannot show plain error because to do so requires him to demonstrate that an unequivocal rule of law was violated in a clear and obvious way. The clear and unequivocal rule of law applicable here is the rule expressed in *Barela, Dike,* and *Beaugureau,* which supports the closing remarks made by the prosecutors.

[¶ 107] Because Duke does not establish plain error, he cannot prevail on his claim that the prosecutors committed reversible error in closing arguments. There is no basis for this Court to examine whether to reject the *Dike* rule. In order for a party to challenge an established rule of law on appeal and urge that this Court abandon that rule of law, the challenge should be initiated in the trial court, at the earliest opportunity, and the issue preserved for appeal. This Court has consistently held that it will not entertain issues raised for the first time on appeal "unless they are jurisdictional issues or issues of such a fundamental nature that they must be considered." *Beaugureau,* at ¶ 11 (citing *Bell v. State,* 994 P.2d 947, 957 (Wyo.2000)); *see also Bailey v. State,* 12 P.3d 173, 177–79 (Wyo.2000). Duke's request does not fall within those requirements.

[¶ 108] The prosecutors' remarks during closing arguments were not improper and did not constitute reversible plain error under existing Wyoming law.

**Issue Seven: Cumulative error**

[¶ 109] Duke argues that his convictions should be reversed because of the cumulative effect of the errors occurring at trial. His contention is that, even if the numerous alleged errors do not require reversal when considered individually, their combined effect does. As shown above, however, no error occurred with respect to most of his claims, and his remaining claims, as demonstrated, did not affect the outcome of his trial. Therefore, Duke's right to a fair trial was not impacted, and his cumulative error claim is meritless. *See Young,* 849 P.2d at 767; *Jennings v. State,* 806 P.2d 1299, 1306 (Wyo. 1991); *Justice v. State,* 775 P.2d 1002, 1011 (Wyo.1989).

[¶ 110] We affirm his convictions in all respects.